UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | Criminal No. 06-311 (RMC) |
| : | |
| v. : | |
| : | |
| MILES N. HOLLOMAN, : | |
| Defendant. : | |

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States, by and through its attorney, the United States Attorney for the District of Columbia, hereby provides the Court with the following memorandum in aid of sentencing.[1]

### INTRODUCTION

The defendant Miles N. Holloman pleaded guilty in two separate cases, Cr. No. 05-092 and Cr. No. 06-311, for his schemes to steal other persons' identities and credit cards numbers to get money and to buy things for himself. This memorandum sets forth the criminal conduct, discusses the stipulated offense level and criminal history score under the Federal Sentencing Guidelines, and lastly addresses the sentencing factors of 18 U.S.C. § 3553.

### DISCUSSION

**I.  Holloman's Schemes to Steal Identities and Credit Card Numbers**

**A.  Blockbuster Video Scheme**

From February to September 2003, defendant Miles Holloman worked at Blockbuster Video, located at 1639 P Street, N.W. Washington, D.C. In this job, the defendant had access to a wide-range of personal information from Blockbuster members. In order to receive a Blockbuster Video membership card, applicants were required to provide their names, dates of birth, social security numbers, addresses, phone numbers, and credit card numbers, and expiration dates of credit cards.

---

[1] This same memorandum is being filed in Criminal Case No. 05-092.

Blockbuster hired Holloman from an "on-line" application where Holloman lied saying that he had never been convicted of a felony.

Not knowing of the defendant's past criminal conviction and supervised release status,[2] a Blockbuster Video supervisor asked the defendant to review membership applications and confirm the telephone numbers (the supervisor even offered the defendant the use of a private room in the back of the store for this purpose). Blockbuster Video lacked controls over the storing and disposing of their membership applications. None of the applications were sequentially numbered (or uniquely identified in any way) and there was no destruction practice (during the time that the defendant worked at Blockbuster Video, the office's shredder was broken). Reportedly, the non-shredded applications were simply tossed out in the trash after about three months.

Defendant Holloman stole the membership applications,[3] and he and a co-conspirator used the credit card numbers to purchase goods and services. At times, the defendant and his co-

---

[2] According to Probation Officer Pedro Tavares, the defendant had been released from jail at the end of January, 2003, which was a few weeks before he was hired at Blockbuster Video. (Memorandum to the Honorable Ellen Segal Huvelle, from Probation Officer Tavares dated October 17, 2003, hereinafter referred to as "Probation Memorandum"). The defendant had been incarcerated for a term of 24 months on the charge of Conspiracy to Commit Access Device Fraud and Misuse of a Social Security Number. Because of the nature of that criminal offense and the defendant's extensive prior criminal charges, the probation office determined that the defendant presented "a specific and/or foreseeable third party risk to his employer [Blockbuster Video] since he has access to credit card and customer information." Probation Memorandum at 4. Thus, in March 2003 Probation Officer Tavares instructed the defendant to tell his supervisor that he (the defendant) had been convicted and was currently on supervised release. In April 2003, the defendant lied to Probation Officer Tavares saying he had informed his supervisor; later, Probation Officer Tavares spoke to the supervisor who denied that the defendant ever said that he had been convicted or was currently on supervised release.

[3] When the defendant was re-arrested, he instructed the co-conspirator to pick up a certain bag and store it at her house, directions which the co-conspirator followed. Over 40 original membership applications were discovered in a bag with other documents with the defendant's name in the co-conspirator's residence pursuant to a court-authorized search warrant.

conspirator ordered merchandise, such as clothing, over the telephone to be delivered to the victim's residence in the District of Columbia. The co-conspirators would wait in the general vicinity of the victim's address for the merchandise to be delivered and then intercept the package from the overnight delivery person. In order to use the stolen information more readily, the defendant possessed counterfeit driver's licenses in the names of the victims, but with a photograph of himself. The defendant also requested replacement credit cards to be sent to the victims' addresses. Again, this mail would be intercepted and later the defendant used the credit cards. The defendant and his co-conspirator purchased merchandise, ordered cellular telephone service, bought and maintained a car, and traveled - all the time using the Blockbuster Video applications' credit card numbers. For example, the defendant used the victims' names, social security numbers, and credit card numbers to: purchase a C230K Mercedes vehicle from EuroMotors; obtain insurance for the Mercedes; repair the Mercedes; travel to New York, Miami, and Las Vegas; purchase items at Best Buy, Sak's Fifth Avenue, Zales Jewelry, among others. In all, the defendant caused about $117,000 worth of financial damage and compromised the credit of about 43 individuals, who had submitted applications for Blockbuster memberships.

      B.    <u>**Nordstrom's Gift Card Scheme**</u>

After pleading guilty to the Blockbuster fraud scheme in June 2005, the defendant was released from jail. Then, from November 2005 to August 2006, the defendant Miles Holloman and co-conspirators defrauded Nordstrom's Department Store of thousands of dollars using gift cards issued by that store. Nordstrom's gift cards are essentially a form of debit card that can be used for purchases up to the amount of the value that had been previously loaded on the card. Value can be

added to the gift cards by means of cash, a credit card, or a bank debit card, and can be done at any Nordstrom's sales counter.

The scheme unfolded as follows: the defendant and others loaded or attempted to load a Nordstrom's gift card with value, using either a bank debit card with an insufficient balance or an unauthorized credit card. Often, prior to this attempt, the gift card only had a minimal value loaded on it. This first individual would not have the physical gift card; rather, he or she simply had the number written on a piece of paper. Second, another member of the conspiracy, who had possession of the actual gift card, would make an purchase of high value luxury items with the physical card in another part of the store, at times in an amount near to the value being loaded. The purchase with the gift card would be approved, notwithstanding the fact that the first transaction – the attempt to load value onto the gift card – had not yet been completed. The attempt to load value on the Nordstrom's card by the first member of the scheme might be ultimately declined because the bank debit card or credit card was invalid, or lacked a sufficient balance, or otherwise closed. In the alternative, the gift card would be loaded with value that would be later rescinded. The sales associate serving the gift card loading transaction was unaware that, during the course of that transaction, the gift card was redeemed in another part of the store. The co-conspirators might keep the items purchased, or at times, return the fraudulently obtained merchandise for cash.

The defendant was an integral participant in the conspiracy. First, in a number of instances the defendant's own unfunded bank debit or credit card was used to attempt to load value onto a Nordstrom's gift card, and that gift card was simultaneously used to fraudulently purchase hundreds of dollars of luxury items. Second, two mobile telephone numbers assigned to him were used to make balance inquiries on at least 36 of the 45 of the Nordstrom's gift cards used to perpetuate the

fraud. Third, the defendant himself returned for cash refunds some of the fraudulently purchased merchandise; he was required to show identification to do so, and the store recorded his name and address at the time of the refund.

Finally, the defendant's place of residence in the District of Columbia was used to store items needed to perpetuate the fraud and fruits gained from execution of the fraud. For example, during a court-authorized search of the defendant's residence in August 2006, agents found: at least two of the Nordstrom's gift cards used in the conspiracy; the Holloman debit card and credit card used to attempt to load value onto the gift cards; slips of paper with names, dates of birth, social security numbers, and credit card numbers of various individuals, including at least two credit card numbers used to load value onto the Nordstrom's gift cards; multiple pairs of shoes purchased with the fraudulent gift cards; slips of paper with at least one of the Nordstrom's gift card numbers used in the conspiracy; and multiple Nordstrom's receipts. Examples of the luxury items the defendant and others purchased in this gift card scam include:

    *sunglasses for $325 and $340 each;

    *jeans for $165 and $180 each;

    *a handbag for $625;

    *a pair of shoes for $480.

In all, 45 Nordstrom's gift cards were abused, with a loss of over $48,000. The defendant and his cohorts used 24 stolen credit card numbers in this scheme, and the defendant illegally possessed personal identifying information (such as dates of birth, addresses, credit card numbers, and telephone numbers) belonging to about 13 individuals.

II.     **Federal Sentencing Guidelines**

Pursuant to the plea agreement, the parties agreed that a correct interpretation of the Federal Sentencing Guidelines would combine the two different matters into a single Guideline calculation thus:[4]

| § 2 | 2B1.1 | | |
|---|---|---|---|
| | | (a) Base Offense Level | 6 |
| | | (b)(1) Loss in excess of $120,000 | 10 |
| | | (b)(2)(B) more than 50 victims | 4 |
| | | (b)(10)(C)(i) unauthorized use of means of identification unlawfully to produce or obtain any other means of identification | 2 |
| | 2J1.7 | Commission of offense while on release | 3 |
| §3 | | 3B1.1( c) Aggravating role | 2 |
| | | 3E1.1 Acceptance of Responsibility | (-3) |
| | TOTAL | | 24 |

The parties also agreed that the defendant's criminal history score was 7, which resulted in a Criminal History Category of IV. Based upon the calculations set forth above, the defendant's Federal Sentencing Guidelines range is 77 to 96 months.

---

[4] Although the calculations of the Federal Sentencing Guidelines can be separate for both cases (Cr. No. 05-092 and Cr. No. 06-311), each case would include the criminal conduct charged in the other case as relevant conduct. *See* U.S.S.G. Section 1B1.3. U.S.S.G. Section 5G1.2, Application Note 1, states that the "grouping" rule applies to "multiple counts of conviction. . .contained in different indictments or informations for which sentences are to be imposed at the same time or in a consolidated proceeding." *See* U.S.S.G. Section 5G1.2 (b) and Application Note 1. Because both offenses involve fraud, the government believes that the two counts of conviction "group." *See* U.S.S.G. Section 3D1.2(d).

**III.    18 U.S.C. §3553 Factors**

  **A.    History and Characteristics of the Defendant**

Title 18 United States Code directs the court to consider the history and characteristics of the defendant. *See* 18 U.S.C. Section 3553(a)(1). In this case, the defendant has demonstrated that he is a unrepentant fraudster. Since the age of 18 (nine short years ago), the defendant racked up four convictions (including the two guilty pleas), with one supervised release revocation, and eight arrests, according to the probation officer's count. Although engaging and energetic, the defendant has wasted his talents by dreaming up schemes to use other people's hard-earned credit and money for his own selfish desires.

  **B.    The Need to Protect the Public from Further Crimes of the Defendant**

Likewise, the Court shall consider ". . .the need for the sentence imposed. . . to protect the public from further crimes of the defendant." 18 U.S.C. §3553(a)(2)( C). The defendant collected a chilling amount of personal information on specific individuals. For example, in the execution of the search warrant on the defendant's residence in August 2006, agents found handwritten notes of individuals' names and addresses, telephone numbers with "h" or "w" notations (home and work numbers), numbers with "ssn" (Social Security number) and DOB (date of birth). Often the handwritten notes included "card info" with credit card numbers, expiration dates, and security codes. With this information, the defendant could impersonate a victim, open new accounts, use existing accounts, and destroy credit histories. No innocent explanation exists for the defendant possessing this much personal information on people other than himself.

**C.      The Need to Reflect the Serious of the Offense and Promote Respect for the Law**

Title 18 U.S.C. §3553(a)(2)(A) requires the Court to consider "the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." Stealing other people's credit and good names is a serious offense. The financial impact is only part of the harm. The identity theft victims also suffer lost time in correcting their credit histories, aggravation from dealing with credit card companies, worry about how their personal information was obtained, and apprehension about whether some other would-be thief will also compromise their private, financial or identifying data. Miles Holloman stole peoples' good names and good credit; the jail sentence should reflect the seriousness of the offense.

**CONCLUSION**

The government respectfully requests that the Court consider the above information in determining the just and appropriate sentence in this case.

                                          Respectfully submitted,

                                          JEFFREY A. TAYLOR
                                          United States Attorney
                                          for the District of Columbia

By:      _____
         VIRGINIA CHEATHAM
         Assistant U.S. Attorney
         Bar No. 411980
         555 4th Street, N.W.
         Washington, D.C.  20530
         (202) 514-9732

CERTIFICATE OF SERVICE

    I hereby certify that on this _____ day of January, 2007, that a copy of the foregoing Sentencing Memorandum was served via ECF to David C. Woll, Counsel for the defendant.

_____
VIRGINIA CHEATHAM
Assistant U.S. Attorney